(28 App. Div. 228.)

## LIPP v. OTIS BROS. & CO. et al.

(Supreme Court, Appellate Division, First Department. April 15, 1898.)

1. Torts—Joint Defendants—Dismissal as to One.

From the principle that, where injury results from negligence in which several parties participate, the injured party may maintain his action against either of the wrongdoers or all, it follows that, if he makes them all defendants, one of them has no ground for objecting to the dismissal of the complaint as to the others, unless the evidence shows that the accident arose solely from the negligence of the latter, or of one of them.

2. Negligence—Question for Jury.

Plaintiff's intestate was employed by the stone-work contractor on a building, in which defendants O. & Co. were putting in the elevators. An exhaust pipe connected with the operation of the elevators had been carried above the roof, but not yet capped. The elevators, though running, had not been turned over to the owner, and on the morning of the accident upon which the action was based O. & Co.'s representative turned on the steam, and shortly thereafter boiling water and steam were thrown out of the exhaust pipe, and scalded plaintiff's intestate, who was working near by. There was evidence that the exhaust drip valves were all open when the steam was turned on, and, on the other hand, evidence from which the jury might have found, from what actually occurred, that condensed steam had collected in the exhaust pipe during the previous night, that the drip valves had not been opened for any appreciable length of time, and that the accident was due to negligence in turning on steam without attending to them. Held, that it was for the jury to determine whether the drip valves had been open during the night.

Ingraham, J., dissenting.

Appeal from trial term.

Action by Philip Lipp, administrator of George Lipp, deceased, against Otis Bros. & Co. and others. From a judgment on a verdict, and from an order denying a motion for a new trial, Otis Bros. & Co. appeal. Affirmed.

Argued before VAN BRUNT, P. J., PATTERSON, O'BRIEN, McLAUGHLIN, and INGRAHAM, JJ.

J. M. Scribner, for appellant.
A. I. Elkus, for respondent Philip Lipp.
J. Larocque, Jr., for respondent Altman.

VAN BRUNT, P. J. This action was brought by the plaintiff, as administrator of George Lipp, deceased, against the corporation of Otis Bros. & Co., appellant, and the firm of Gillis & Geoghegan and one Benjamin Altman, to recover damages resulting from the death of the decedent, alleged to have been caused by the negligence of the defendants. Upon the trial of the action the complaint was dismissed as against the defendants Gillis & Geoghegan and Altman, and the jury found a verdict in favor of the plaintiff against the corporation, Otis Bros. & Co., the present appellant. In discussing the questions presented upon this appeal, the propriety of the ruling of the court in dismissing the complaint as to Gillis & Geoghegan and Altman cannot be considered, unless the evidence introduced upon the trial shows that the accident arose solely from the negligence of those defendants, or one of them.

It is a familiar principle that, where several parties participate in a wrong, or where injury results from negligence in which several parties participate, the person injured may maintain his action against either of the wrongdoers or all. It therefore follows that, although the defendants Gillis & Geoghegan and the defendant Altman may have contributed by their action to the happening of the accident, yet, if the negligent participation of the defendant appellant was necessary to accomplish the result, it is liable, even though the other wrongdoers should not be pursued, or though the complaint as to them should be dismissed. Barrett v. Railroad Co., 45 N. Y. 628. It appeared from the evidence that the defendant Altman, during the summer of 1896, was the owner of and engaged in constructing a new building on Eighteenth and Nineteenth streets as an extension to his previously existing store on the westerly side of Sixth avenue in the city of New York. For that purpose he made a contract with the defendants Gillis & Geoghegan to provide the steam fitting, boilers, pumps, etc., which might be required in said building as per certain specifications. These specifications included the exhaust pipes which will he hereinafter referred to. The defendant Altman made another contract with the defendant Otis Bros. & Co. to furnish and erect for use in said building ten hydraulic passenger elevators, and to extend the rise of two other elevators, and to furnish and erect certain hydraulic dumb waiters, according to specifications set out in the case. These specifications required the construction of certain pumps necessary for the operation of the elevators, but the steam connections with the pumps were to be made by the owner of the building, and this work was included in the contract between him and Gillis & Geoghegan. The defendant Altman had a third contract with B. A. & G. N. Williams for the cut stone work of the new buildings, and the deceased was one of Williams' employés. He was at work on the 11th of August, 1896, the day of the accident, cutting and fitting stone on the stone railing on top of the Eighteenth street wall of the building. The contract of Gillis & Geoghegan provided that they should also furnish all valves, pipes, and fittings, and make all steam-drip and exhaust connections with the elevator pumps, and also all connections for feeding the boilers, and for returning the waters of condensation back to the boiler. They were also to carry the 14-inch exhaust pipe to and above the roof of the building, which was to be there capped with an approved exhaust head with drip down to the blow-off tank in the cellar. The exhaust from the pumps was connected with this 14-inch main exhaust. There was a drip at the bottom of the main exhaust having no valve, and which was necessarily always open. There were also valves both in the steam pipes and the exhaust-pipe connections, with the pumps and drips just above these valves. The exhaust connecting the pumps with the main exhaust was a 10-inch pipe part of the way, and part of the way a 14-inch pipe, and was of considerable length. Upon the day of the accident, Gillis & Geoghegan had carried the 14-inch exhaust pipe to the roof, and then it had been carried a short distance in a horizontal

direction, but no exhaust head had been yet put on. The work had so far progressed that the elevators had been in use for a considerable period of time, steam being supplied from the boilers which had been put in by Gillis & Geoghegan, and the exhaust carried from the elevator pumps by the exhaust pipe constructed by Gillis & Geoghegan. Although the elevators had been in operation for some time, the appellant, Otis Bros. & Co., was still in charge of these elevators and the pumps which operated the same, and had not turned over the work to the defendant Altman. These elevator pumps were arranged so that they would run automatically, and they had been in use so that some of them at least ran all night. A man named William Jurgensen was in charge of the work which Otis Bros. were doing in the construction of these elevators and pumps in this building. Upon the morning of the 11th of August, 1896, the attention of Jurgensen was called by one Cullen, the assistant engineer of Altman, who was then on duty, to the fact that the elevator was running very slow, and would not carry any weight. Jurgensen and Cullen went together to the pump that operated the elevator. It was moving very slowly. Jurgensen examined the valves on the pump, and found everything apparently all right except the steam valve, the supply to the pump, which he found nearly closed, "just off its seat." This valve he opened gradually, and started the pump going. Before opening the valve, he looked at the water gauge, which ought to have shown 120 pounds pressure, and found it between 75 and 80 pounds. The pressure soon went up to its normal condition. Jurgensen further testified that there were certain drip valves attached to the exhaust pipe, which allowed the condensation from the steam in the exhaust pipe to pass away, and that he did not inquire or ascertain or observe whether the drip valves were open that morning. In another place, however, he testified that he examined the drip valves upon the pump, but that he did not examine those on the exhaust pipe. Cullen, when he was examined, stated that he examined all the drip valves at the time the steam was turned on, and that they were open. Jurgensen was aware of the incomplete condition of the exhaust pipe upon the roof. He was also aware that workmen were engaged upon the roof. In about half an hour after this valve had been opened, and the steam turned upon this pump, a large quantity of boiling water and steam were thrown out from this 14-inch exhaust pipe upon the roof, over the front of the building into the street, and the deceased, who was working upon the stone work in front of the building, was scalded to death. The evidence tends to establish that during the night there must have collected a large quantity of condensed steam in some part of this exhaust pipe, and that it was thrown out when the steam let into the exhaust from the pump had acquired sufficient power to force the water out of the top of the 14-inch exhaust pipe, thus causing the accident. The evidence further tended to show that with the exhaust drip valves open there was no possibility of the collection of such a body of water in the exhaust pipe; and also that it would be negligence, where a steam plant was in oper-

ation, to turn on steam without first ascertaining whether the drip valves had been opened, so that water had not collected in the exhaust. The evidence further tended to show that, if such drip valves were shut, the water would not be discharged from the exhaust immediately upon the opening of these valves, but that it would require some lapse of time after the opening of the valves to allow the water to escape.

Now, it is clear upon this condition of the evidence that if Jurgensen turned on this steam, paying no attention to the fact as to whether the drip valves were open or not, being aware that a small amount of steam had been escaping through the steam valve all night, and that, if the drip valves were closed, it might have condensed, and lain in the exhaust pipe, he knew that the inevitable result would be to force this condensation out of the top of the exhaust pipe, and would necessarily endanger every person working in its vicinity. Such an act upon his part would be clearly negligence in the management of this machinery of which he was in charge as the representative of the appellant defendant. It is undoubtedly true that there was evidence from which the jury might have found that these drip valves were open, and that no condensation should have occurred in the pipe; the positive evidence being that, had the drip valves been open, such condensation would not have remained in the pipes, and could not have been blown out in the manner in which it was done on turning steam upon the pump. There was also evidence from which the jury might, from the fact that this condensation was blown out of the exhaust after the steam had been turned on the pump, have found that the drip valves connected with the exhaust had not been open for any appreciable length of time before the turning on of the steam, and that the accident happened because of the negligence of Jurgensen in turning on the steam without paying attention to the drip valves. Upon this state of the proof it was for the jury to determine whether the evidence that these drip valves had been open during the night was true or not.

It is urged upon the part of the appellant that the action of Gillis & Geoghegan in allowing this steam plant to be used, without the main exhaust being capped with the exhaust head required by the terms of the contract, was negligence upon their part, and contributed to the happening of the accident. Even if this be so, it does not relieve the appellants, because the negligence of their employés also contributed to the happening of the accident by turning steam upon the pump without ascertaining whether the exhaust was free or not.

It is also claimed that error was committed in the admission of evidence in regard to the family relations of the deceased and the plaintiff. It appears that the deceased was in the habit of giving all his earnings to his father, who gave him a small amount for his own expenses, and used the balance in support of his (plaintiff's) family. In this state of the case it was entirely proper for the plaintiff to show what use he had been accustomed to make of the wages which he had received from the deceased, and how necessary

it was for the support of those whose welfare he had been accustomed to look after.

Upon the whole case, therefore, there seems to have been no error committed prejudicial to the appellant, and the judgment and order should be affirmed, with costs. All concur, except INGRAHAM, J., dissenting.

INGRAHAM, J. (dissenting). The accident which resulted in the death of the plaintiff's intestate was caused by a discharge of hot water from an exhaust pipe upon the roof of a building in course of construction. The ground upon which the learned court below refused to dismiss the complaint as to the defendant company was that there was evidence that the said defendant's foreman was negligent in turning the steam on to the pumps which furnished the motive power for the elevators, which were in charge of the defendant company. The foreman, who was called as a witness for the plaintiff, testified that it would be an act of negligence to turn on this steam without having first examined to see whether the drips connected with the pumps were open, so that when the steam was turned on there would be no accumulation of water in the pumps or the exhaust pipes. But the same witness testified, as did another witness called by the plaintiff, that before this steam was turned on these exhaust pipes were examined, and found to be open, and that there was no indication of any accumulation of water in the pipes at the time the steam was turned on. There was no testimony introduced on behalf of the plaintiff to contradict the evidence of the foreman and the engineer of the building. The court, however, held that, although these witnesses were called by the plaintiff, and swore positively that these drips were open, the jury could find that their testimony was not true, from the fact that, after the steam was turned on, the water was violently expelled from the exhaust pipe upon the roof; in other words, that the fact that there was water in the exhaust pipe leading from the cellar to the roof which the steam, after it had worked the pump, blew out of the pipe, was evidence from which the jury could find that the testimony of the defendant company's foreman, and the other witnesses who positively testified that these pipes connected with the pumps were open, was untrue. The evidence is uncontradicted that when the defendant company's foreman arrived at the building in the morning he found the steam pressure to the pump to be 75 pounds to the square inch. The pressure was sufficient to move the elevator with one passenger, but not sufficient to move it when more heavily loaded. The pumps and the whole machinery were apparently in good working order, but the pressure of steam was not sufficient to operate the heavily loaded elevator. There was nothing to indicate that there was any accumulation of water in the pumps, or that there was anything the matter with the pumps, except the fact that the pressure of steam was not sufficient, and it would seem from the evidence that, if the water had accumulated in the pumps during the night, with this pressure of 75 pounds of steam, its effect would have been notice-

51 N.Y.S.—2

able in the morning, so that the accumulation of water would have been the reason of the refusal of the elevators to act, instead of the insufficient pressure of steam. All that the defendant company's foreman did was to increase the pressure from 75 pounds to 120 pounds to the square inch. There was nothing to show that this increased pressure would blow out this pipe, when the former pressure of 75 pounds would have been insufficient for that purpose. It may be surmised that, if the drips had been closed, and if water had been allowed to accumulate in considerable quantity in these pumps and in the exhaust pipes connected with the roof, the turning on of the steam at the pumps would gradually have caused that water to be forced up to the roof, and would have been sufficient to force the water out of the pipes upon the roof. But it does not appear that there was not other means by which this water could have accumulated in this exhaust pipe to the roof, except from these pumps, and it does not, therefore, follow, because water was blown out of the pipes in the roof, that it had accumulated in the pumps or the pipes connected with the pumps, or that the defendant's foreman did not examine the drips before he turned on the steam, because of the fact that there was water in the exhaust pipes to the roof, which was subsequently blown out by the pressure of steam from the pumps. Here the steam had been on during the night at a pressure of 75 pounds, the pumps working apparently without difficulty, except that the force was not sufficient to move a loaded elevator. There was no evidence to show that simply increasing the pressure of steam supplied to the pumps would be likely to cause such an accident as followed, especially if the drips from the pumps were open; and there was no evidence that they were not. I think, therefore, that the finding of the jury that the defendant company's foreman did increase the pressure of steam without examining the valves to see whether the drips from the pumps were open or not was unsupported by the evidence, and for that reason the judgment should be reversed.